**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JANE DOE 1 (A.E.). JANE DOE 2 (C.M.), AND JANE DOE 3 (J.L.C.), individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>G6 HOSPITALITY LLC.; G6 HOSPITALITY, IP, LLC; G6 HOSPITALITY PROPERTY, LLC ; G6 HOSPITALITY PURCHASING, LLC,; MOTEL 6 OPERATING, LP,; G6 HOSPITALITY FRANCHISING, LLC.; and XYZ CORPORATIONS 1-100<br>Defendant | CASE NO.<br><br>JUDGE:<br><br>MAGISTRATE JUDGE: |

**CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Jane Doe 1 (A.E.), Jane Doe 2 (C.M.), and Jane Doe 3 (J.L.C.) (together "Jane Does" or "Named Plaintiffs"), individually and on behalf of members of the Class by and through undersigned counsel, bring this action against G6 Hospitality LLC.; G6 Hospitality, IP, LLC; G6 Hospitality Property, LLC ; G6 Hospitality Purchasing, LLC,; Motel 6 Operating, LP,; G6 Hospitality Franchising, LLC.; and XYZ Corporations 1- 100 (together "Defendants") on behalf of themselves and all others similarly situated and make the following allegations based upon information, attorney investigation and upon the Named Plaintiffs' own knowledge:

**PRELIMINARY STATEMENT**

1. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many

state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

2. For years, major hotel brands have made public claims that they are combatting human trafficking, while at the same time expanding their economy hotels where sex trafficking is most prevalent and profiting from crimes that are perpetrated on their properties. Despite corporate public statements, human trafficking continues to be most prevalent and lucrative in the hotel and hospitality industry.

3. Criminals parade their misconduct openly on hotel and motel properties throughout the United States, that continue to profit from providing harbor and facilitation for the underlying assaults. The hotel and hospitality industry continues to create and expand the environment for traffickers to harbor victims and neglect taking reasonable steps to prevent such criminal misconduct, instead choosing to earn a profit at the expense of human life, human rights, and human dignity.

4. Public appearances and sponsorships do not excuse corporations and individuals that have financially benefited from sex trafficking. In fact, it reveals corporate knowledge of the use of their properties and technology as hubs for human trafficking. The hotel industry has provided the means, environment, and support for the human trafficking industry to become one of the largest profitable criminal activities in the United States. As such, as the trafficking industry grows, so have Defendants and their profits through the expansion of their properties and rooms rented for this explicit and apparent purpose.

5. As such the Named Plaintiffs, individually and on behalf of members of the Class, bring this action pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1595. *Doe v. Mindgeek United States Inc.*, 702 F.

Supp. 3d 937, 942 (C.D. Cal. 2023) (certifying Rule 23 class under TVPRA); *Doe v. MG Freesites, Ltd.*, No. 7:21-cv-00220-RDP, 2025 LX 87117, at *27 (N.D. Ala. May 6, 2025) (denying defendants' motion for interlocutory appeal of class certification of porn hub victims under the TVPRA).

6. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or should know engages in criminal sex trafficking.

7. As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like the plaintiffs and class of plaintiffs in this case, with minimal risk of detection or interruption.

8. Defendants, each enabled, harbored, held, facilitated, and financially benefited from a venture that violated the TVPRA in which Plaintiffs were trafficked for the purposes of commercial sex and sexual exploitation in violation of 18 U.S.C. §1591(a); as well as 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

9. Specifically, the CAVRA codified at 18 U.S.C. § 2255, creates a federal civil cause of action for individuals who, as minors, were victims of child sexual exploitation, child pornography, or related abuse criminalized under Chapter 110 of Title 18 of the United States Code.

10. CAVRA is expressly remedial and is intended to provide victims a meaningful avenue to obtain compensation for the severe and lasting harms caused by child sexual abuse and exploitation.

11. Additionally, the Named Plaintiffs, individually and on behalf of members of the Class, bring this action pursuant the Racketeer Influences and Corrupt Organizations Act ("RICO") 18 U.S.C § 1961-1968, enacted to combat organized crime by targeting the ongoing, systematic operations of criminal enterprises, rather than merely individual criminal acts.

## PARTIES

12. Jane Doe 1 (A.E.) is a natural person who is currently a resident and citizen of Ohio and resides in the Southern District of Ohio. C.M. is a survivor of sex trafficking. In 2017, she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

13. Jane Doe 2 (C.M.) is a natural person who is currently a resident and citizen of South Carolina. C.M. is a survivor of sex trafficking. In 2020, she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants.

14. Jane Doe 3 (J.L.C.) is a natural person who is currently a resident and citizen of North Carolina. J.L.C. is a survivor of sex trafficking who was trafficked as a minor. In 2016, she was harbored and forced to engage in commercial sex acts for the benefit of her traffickers and Defendants

a. Due to the sensitive, private, and potentially retaliatory nature of these allegations, this complaint identifies the Jane Does by a pseudonym only. The Jane Does will move the court to proceed under a pseudonym in all filings, all public Court proceedings, and to limit the disclosure of information about the Jane Does' identities in order to protect the Jane Does and the Jane Does' identities.

b. Generally, pleadings must state the name of all parties. However, there are exceptions when the issues involved may result in retaliation or harm to the Named Plaintiffs. For good cause, the Court may issue an order to protect a party or person from undue harms and burdens.

c. To maintain their privacy and safety, the Jane Does should not be compelled to disclose their identities. The Jane Does' privacy interest substantially outweighs the customary practice of judicial openness. The Named Plaintiffs would be in danger of being forced back into trafficking should her traffickers or their associates learn information about her through publicly filed documents in this action. Additionally, the Jane Does' lives could be put in grave danger should their traffickers or their associates learn information about her through publicly filed documents in this action. Moreover, Defendants will not be prejudiced. The Jane Does agree to reveal their identities to Defendants for the limited purpose of investigating their claims once the parties have entered a protective order.

15. Defendant G6 Hospitality, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

a. Defendant G6 Hospitality LLC is a privately held hospitality company that owns, controls, franchises, and operates the Motel 6 and Studio 6 brands throughout the United States.

b. Although G6 Hospitality, LLC is a privately held company and does not file public Form 10-K reports, Defendant G6 Hospitality LLC operates through a highly centralized franchising and technology-driven business model, exercising

substantial control over branded properties, reservation systems, operational standards, pricing, staffing models, and mandatory technology platforms.

c. G6 Hospitality, LLC conducts franchising operations through affiliated entities, including but not limited to: G6 Hospitality Franchising, LLC and Brand-specific franchisor entities for Motel 6 and Studio 6.

16. Defendant G6 Hospitality Property, LLC is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

17. Defendant G6 Hospitality Purchasing, LLC, is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

18. Defendant G6 Hospitality Franchising, LLC is a Delaware limited liability company that serves as the franchising entity for the Motel 6 and Studio 6 brands in the United States. Its principal business address is 4001 International Parkway, Carrollton, Texas 7500.

a. G6 Hospitality Franchising, LLC is the entity that issues, manages, and governs franchise rights for: Motel 6® and Studio 6® under those service marks throughout the United States.

b. G6 Hospitality Franchising, LLC appears in Franchise Disclosure Documents (FDDs) as the franchisor that enters into franchise agreements with U.S. franchisees.

c. According to G6 Hospitality Franchising, LLC's FDDs franchisees are required to:

i. Operate strictly under G6-mandated brand standards;

ii. Use corporate-approved reservations, property-management, and payment systems;

iii. Comply with confidential Operating Manuals, unilaterally amendable by G6;

iv. Submit to brand inspections, audits, and enforcement actions;

v. Adhere to mandatory renovation, conversion, and construction addendums;

vi. Participate in centralized marketing, loyalty programs (e.g., My6), and data collection.

vii. Failure to comply exposes franchisees to fines, default, or termination, demonstrating G6's right of control over day-to-day hotel operations.

19. Defendant Motel 6 Operating, LP, is a for-profit Delaware corporation with its principal place of business in Carrollton, Texas.

20. Defendants John Does 1-100 are fictitious names used because the true names and legal capacities of additional defendants are presently unknown. However, these defendants include, but are not limited to, any affiliated entity, parent company, subsidiary, franchisee, franchisor, management company, property owner, operator, or agent that owned, controlled, managed, operated, or was otherwise responsible for the subject hotel, property, transaction, or conduct alleged herein.

21. Defendants, G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, LP will collectively be referred to as "the Defendants ."

22. As a direct and proximate result of Defendants' consistent refusals to prevent human trafficking on their hotel properties, Jane Doe and similarly situated Plaintiffs were sex trafficked, exploited and victimized repeatedly.

23. Plaintiff, individually and on behalf of members of the Class, also seeks certification of a class action for damages and/or for the resolution of key issues, as well as injunctive relief.

## JURISDICTION AND VENUE

24. The Named Plaintiffs, individually and on behalf of members of the Class, incorporate by reference all preceding allegations as though fully set forth herein.

25. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

26. This Court has subject matter jurisdiction of Plaintiff's TVPRA 18 U.S.C. §1595. and CAVRA claims pursuant to 18 U.S.C. § 2255,

27. This Court has subject matter jurisdiction under RICO 18 U.S.C. § 1965(a) because Defendants may be found in the Southern District of Ohio, "has a agent" in the Southern District of Ohio and transacts its affairs in the Southern District of Ohio.

28. This Court also has subject matter jurisdiction over Plaintiff's class action claims pursuant to 28 U.S.C. § 1367, as the amount in controversy exceeds $5,000,000 and there is minimal diversity as to the parties.

29. This Court has personal jurisdiction over each Defendant because each Defendant conducts business in Ohio and has sufficient minimum contacts with Ohio.

30. Venue is proper in this District under 28 U.S.C. § 1391, because each Defendant does substantial business within this District and Plaintiff is a resident of this District.

## FACTUAL BACKGROUND

**Sex Trafficking under Federal Law**

31. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."

32. Put simply, sex trafficking is the sale of enslaved human beings for sex through force, fraud or coercion. It is nothing less than modern day slavery.

33. Pursuant to 18 U.S.C. §1591(a), any person or corporation who knowingly provides or obtains commercial sex that was provided or obtained through force, fraud, and coercion is engaging in sex trafficking. Accordingly, both the traffickers ***and*** the Johns, or buyers of forced commercial sex, are engaged in sex trafficking pursuant 18 U.S.C. §1591(a).

34. Pursuant to 18 U.S.C. §1595(a):

> "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees."

35. The requirements for liability under § 1595(a) can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." § 1595(a). *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019)

36. Pursuant to the TVPRA, a corporation cannot profit from what it knows or should know is a venture in violation of the TVPRA.

37. The TVPRA does not provide any exceptions for hotel brands like G6. Therefore, Defendants have a duty to ensure those profits did not result from a venture that violates the TVPRA. Because Defendants profit from renting rooms, Defendants have an affirmative duty to ensure compliance with the TVPRA, independent of any other entity that may be associated with a particular hotel property.

**Commercial Sex Acts Involving Minors Is Sex Trafficking**

38. Under 18 U.S.C. § 1591(e)(3), the term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3).

39. Section 1591(a)(1) and (a)(2) make it a crime to benefit, financially or by receiving anything of value, from participation in a venture which knowingly recruits, entices, harbors, transports, provides, obtains, maintains, patronizes, or solicits by any means a person for commercial sex, where the person is under 18, or induced by force, fraud, or coercion. 18 U.S.C. § 1591(a)(1).

40. The TVPRA, as amended in 2008, improved a victim's ability to hold traffickers accountable by eliminating the requirement to prove a particular defendant knew a sex trafficking victim was a minor, in cases where the defendant had a reasonable opportunity to observe the minor. The TVPRA also significantly expanded the civil cause of action to include those who financially benefit from what they know or should know is a violation of the TVPRA.

41. Plaintiff has sufficiently pled that she was a victim of sex trafficking within the meaning of 18 U.S.C. § 1591 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

**G6 Business Operations**

42. G6 is one of the largest hotel operators in the world. Upon information and belief, G6 operates nearly 1,500 branded properties worldwide.

43. Upon information and belief, the G6 name is prominently displayed across all facets of its branded properties, including exterior signage at the properties, lobby and front desk areas, room materials, keycards, the company's website and company uniforms.

44. G6 employs individuals throughout its hotel properties to perform duties including but not limited to front desk clerks, cleaning personnel, booking agents, and internet marketers. Upon information and belief, as a franchisor, G6 purports to require its properties to abide by procedures and practices to ensure the standards associated with G6 are upheld. Upon further information and belief, G6 provides its brands and properties access to a brand wide central reservation system, marketing program, 800 numbers, revenue management tools, loyalty programs, and business reports. Thus, booking and room reservations are controlled by G6.

45. G6 profits from every room booked at every brand on every property.

46. G6 may enforce its standards through periodic inspections of properties and may disqualify a property as qualified to carry the G6 name.

47. According to its website, "[w]e believe everyone should have a right to travel, so we give people an affordable, welcoming place to rest wherever their journey takes them. For over 60 years, we've been known as the best place to find a clean, comfortable room with great service at a fair price."

48. According to its website, G6 operates nearly 1,500 hotels.

49. As the hotel operator, G6 controls the training and policies for its branded properties.

50. G6 receives a percentage of the gross room revenue from the money generated by the operations of the G6 branded properties at which Plaintiff was trafficked.

**Defendants and the Hospitality Industry's Participation in the Sex Trafficking Industry**

51. Human trafficking is the world's fastest growing crime.[1] While the term 'human trafficking incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.[2]

52. Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

53. The hospitality industry plays a crucial role in the sex trade.[3] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for their offending. Hotels offer anonymity and non-traceability making them ideal venues for crime, particularly sex trafficking.

54. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[4] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues for sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who

---

[1] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[2] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.

[3] Giovanna L. C. Cavagnaro*, Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[4] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendant's Wi-Fi to advertise and solicit victims for commercial sex against their will.

55. According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[5] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

56. Traffickers use hotels such as Defendants' hotels as the hub of their operations. Once inside, the victims are forced to be available for 'in calls' where they are harbored, raped, assaulted, and forced to service buyers, or 'Johns,' who come to the hotel solely to purchase sex.

57. Hotels, including G6, are also the venue of choice for Johns seeking an 'out call' wherein Johns pays for a hotel room, and the trafficker delivers the victim to the Johns room to complete the transaction. Unsurprisingly, those on the demand side of this transaction (*i.e.*, those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels.[6]

58. This problem happens in an industry widely known. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[7]

59. Every day, thousands of Defendants' employees witness sex trafficking manifestations and commercial exploitation. Thus, Defendants have the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

---

[5] National Human Trafficking Hotline Statistics, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

[6] Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, at X.

[7] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry,* CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

60. In the hotel industry, it is easy to detect common red flag indicators of sex trafficking through proper policy and procedural implementation and training. The indicators of sex trafficking are well known and common across all brands, geographical locations, and properties. Nevertheless, Defendants and the hospitality industry consistently and systematically fail to exercise proper diligence with regard to trafficking taking place on its properties.

61. The Polaris Project reports that "75% of survivors responding to Polaris's survey reported encountering hotels at some point during their exploitation. Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff" despite the relatively overt signs of trafficking.[8]

62. Nevertheless, for years, Defendants, as well as other major brands in the industry, have taken a laissez-faire position that indicates their apathy toward the role their venues play in the furtherance of sex trafficking. Further, Defendants, as well as other major brands and trade associations, have posited that it would be impossible to manage or control what happens on every property.

63. As a result of Defendants' overall complacency in addressing the issue, its brands and properties are a venue of choice for sex trafficking.[9] Traffickers and buyers capitalize on Defendants and the hotel industry's general refusal to adopt, implement, and enforce industry-wide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale. As aptly stated in a publication by the Cornell University School of Hospitality, "the

[8] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).

[9] *Hotels Initiative,* THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[10]

64. As a result of its unique position in this epidemic, Defendants have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.

65. Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation of Defendants. The presence of sex trafficking and sexual exploitation in a hotel is a frequent and obvious occurrence. Numerous well-researched training and toolkits have been published specifically to the hotel industry over the last decade to help hotel staff in every position to identify the signs, however unutilized, underutilized, or ineffectively utilized in their implementation. [11]

66. From check-in to check-out, numerous indicators exhibit obvious telling behaviors from traffickers and their victims during their stay at a hotel. With proper training and the implementation of reasonable identification and reporting protocols, Defendants could have recognized the occurrence of human trafficking, prevented it from occurring, and ensured its profits were not the result of sex trafficking ventures.

67. Defendants' failure to implement policies that would detect obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to

[10] Giovanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility (2017)*, at 1.
[11] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[12]

68. Hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[13] Thus, Defendants should have known that trafficking was occurring on its premises by merely adopting policies and procedures related to sex trafficking and enforcing those policies and procedures as brand standards down to the property level.

69. To ensure its compliance with the TVPRA by not profiting from trafficking ventures, Defendants have a duty, at a minimum, to mandate that *all* staff working at *all* hotel properties across its brand complete sex trafficking identification training.[14]

**Defendants' Willful Blindness to Sex Trafficking in its Hotels**

70. G6 has been cognizant of its role and responsibilities in the sex trafficking industry for years.[15]

71. Defendants trained only some employees to look for signs of trafficking and failed to fully and continuously implement policies companywide.

72. For years, a rampant culture of sex trafficking has existed and gone unchecked on Defendants' properties throughout the country.

73. As illustrated by various published media reports (cited below), G6 brands have

---

[12] *Id*. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[13] Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*,

[14] Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*

[15] *See e.g.*, G6 Hospitality LLC, *G6 Hospitality Partners with ECPAT-USA to Combat Trafficking and Exploitation* (July 30, 2019) (press release), https://g6hospitality.com/g6-hospitality-partners-with-ecpat-usa-to-combat-trafficking-and-exploitation/.

been in the news for sex trafficking related problems over many years:

a. In October 2024, a married couple was arrested and charged with sex trafficking of a minor, after sheriff's deputies rescued a 15-year-old girl from a Motel 6 in Riviera Beach, Florida.[16]

b. On January 13, 2022, four individuals were indicted by a Fulton County, Georgia grand jury, for knowingly harboring a person under the age of 18 years for the purpose of sexual servitude at an area Motel 6.[17]

c. In August 2019, a man was arrested and charged with human trafficking and aggravated promotion of prostitution for trafficking a woman out of a Motel 6 in Great Falls, Montana.[18]

d. In August 2013, three individuals were arrested by the FBI for operating a sex trafficking ring involving two missing 15-year-old girls, who were trafficked out of a Motel 6 in San Antonio, Texas.[19]

e. Five individuals were arrested following an FBI investigation into a human trafficking scheme at a Motel 6 in Madison, Alabama, where a 15-year-old girl from Memphis, Tennessee was being exploited.[20]

---

[16] *Missing teen found in Motel 6 during sex trafficking probe; husband and wife arrested*, *Palm Beach Post* (May 22, 2025), https://www.palmbeachpost.com/story/news/crime/2025/05/22/venezuela-florida-couple-prison-teen-sex-trafficking/83741986007/.

[17] Office of the Georgia Attorney General (Chris Carr), *Carr: Human Trafficking Prosecution Unit Indicts Four Individuals in Fulton County* (Jan. 14, 2022) (press release), https://law.georgia.gov/press-releases/2022-01-14/carr-human-trafficking-prosecution-unit-indicts-four-individuals-fulton.

[18] MTN News, *Sanders Charged With Human Trafficking in Great Falls*, *KRTV* (Aug. 16, 2019), https://www.krtv.com/news/crime-and-courts/sanders-charged-with-human-trafficking-in-great-falls.

[19] Stephanie Serna, *Sex Trafficking Ring Busted at Motel 6*, *KSAT* (Sept. 17, 2013), https://www.ksat.com/news/2013/09/17/sex-trafficking-ring-busted-at-motel-6/.

[20] *5 Arrests Made in Madison Co. Human Trafficking Case*, *WAFF* (Dec. 7, 2012), https://www.waff.com/story/20289792/4-people-charged-with-human-trafficking-in-madison-co/

74. Despite the numerous incidents of trafficking in and around its properties, which put G6 on notice of these horrible problems, G6 failed to implement and enforce any policy or policies that would reduce or eliminate this activity in its hotels.

75. Defendants also have access to public police reports, news reports, and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations.

76. Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

77. Defendants violated their duties under the TVPRA in the following ways:

a. Defendants did not adequately distribute information to assist employees in identifying human trafficking;

b. Defendants failed to provide a process for escalating human trafficking concerns within the organization;

c. Defendants failed to mandate managers, employees, or owners attend training related to human trafficking;

d. Defendants failed to provide new hire orientation on human rights and corporate responsibility;

e. Defendants failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

f. Defendants failed to develop and hold or require ongoing training sessions on human trafficking; and/or

g. Defendants failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

**G6 Parent Hotel Defendants' Control Over Their Franchisee Hotel Properties**

78. Defendants, G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC and Motel 6 Operating, LP will collectively be referred to as "G6 Parent Hotel Defendants."

79. G6 Parent Hotel Defendants are vicariously liable for the acts, omissions, and knowledge of the franchisee employees and staff, whereby G6 Parent Hotel Defendants' actual agents or subagents.

80. Upon information and belief, it is a standard practice in the hospitality industry, followed by G6 Parent Hotel Defendants, for Parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that are placed on the beds, to the types of payments accepted, to when, where, and how guests are greeted.

81. G6 Parent Hotel Defendants provide their Motel 6 locations with signage on and in front of the buildings. This is being done to assure customers that when they check in, they can expect an experience consistent with the standards of the Parent Hotel Brand. This brand logo is displayed on everything in the hotel, such as pens and paper on the bedside table and staff uniforms worn at the front desk during check-in.

82. G6 Parent Hotel Defendants provide their hotel branded locations brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online agency databases. They also provide access to their brand-wide central reservation systems,

800 numbers, revenue management tools, brand loyalty programs, and company websites. Therefore, bookings and room reservations are primarily controlled by Parent Hotel Defendants.

83. G6 Parent Hotel Defendants subject their hotel locations to detailed standards and requirements regarding the operation of their franchisees through agreements, detailed written policies and manuals and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by G6 Parent Hotel Defendants.

84. G6 Parent Hotel Defendants require their branded hotel properties to use a property management system. This too, among other things, receive reservations, and process payment transactions.

85. Upon information and belief, according to the relevant agreements, G6 Parent Hotel Defendants may enforce their brand standards through periodic inspections of the hotel locations, backed up with the ultimate threat of termination of the agreement.

**Franchisee Employees and Staff Acted as Agents of G6 Parent Hotel Defendants**

86. G6 Parent Hotel Defendants are vicariously liable for the acts, omissions, and knowledge of their employees and staff of the location named herein, which are G6 Parent Hotel Defendants' actual agents or subagents.

87. G6 Parent Hotel Defendants subjected franchisee properties to detailed standards and requirements through their agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting, and expectations imposed by the G6 Parent Hotel Defendants.

88. G6 Parent Hotel Defendants obscure the full extent of control they exercise over their branded properties by treating the manuals and certain policies as confidential and proprietary

and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that G6 Parent Hotel Defendants impose on their branded properties:

a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools used at their Motel 6 locations;

b. Covered virtually all aspects of hotel operations, including internal operating functions;

c. Dictated the specific manner in which franchisee property and hotel staff must carry out most day-to-day functions;

d. Significantly exceeded what was necessary for G6 Parent Hotel Defendants to protect its registered trademarks.

89. In addition to the ways described above, upon information and belief, G6 Parent Hotel Defendants exercised and reserved the right to exercise systemic and pervasive control over G6 Hospitality Property, LLC's day-to-day operation of franchisee properties and hotels, including in the following ways:

a. G6 Parent Hotel Defendants required G6 Hospitality Property, LLC and management of the hotel to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for G6 Parent Hotel Defendants to protect their registered trademarks;

b. G6 Parent Hotel Defendants provided training in hotel management and select hotel staff on-site of franchisee properties;

c. G6 Parent Hotel Defendants required all hotel staff to participate in training it was created through an online learning platform it controlled and maintained;

d. G6 Parent Hotel Defendants controlled training provided by franchisee properties to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. G6 Parent Hotel Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that franchisee properties and hotels were required to purchase to operate; G6 Parent Hotel Defendants designated approved vendors and prohibited the hotel from purchasing goods and services from anyone other than an approved vendor;

g. G6 Parent Hotel Defendants established detailed job descriptions for all positions in its properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must be performed, which tasks and how they must do so.

h. G6 Parent Hotel Defendants set requirements for the hiring process used by its properties and oversaw employee discipline processes and termination decisions.

i. G6 Parent Hotel Defendants required their franchisee properties to use a customer resource management program maintained and operated by the G6 Parent Hotel Defendants;

j. G6 Parent Hotel Defendants controlled channels for guests to report complaints or provide feedback regarding their franchise locations and directly participated in the response and/or supervised the response to customer complaints or other

feedback. G6 Parent Hotel Defendants retained the right to provide refunds or other compensation to guests.

k. G6 Parent Hotel Defendants set detailed requirements for insurance that their properties must purchase and retain the right to purchase insurance for the locations and to bill the hotel owner directly for that insurance if G6 Parent Hotel Defendants determine that the property has not purchased adequate insurance;

l. G6 Parent Hotel Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of agreements if franchisee locations violated any of the G6 Parent Hotel Defendants' detailed rules, expectations, protocols, or policies;

m. G6 Parent Hotel Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

**G6 Parent Hotel Defendants Knowingly Benefited from Participation in a Venture with Franchisee Properties**

90. Hotel brands own property and lend their name and likeness to third party owners, while the building and operations are under the brands' supervision and control. This is done through brand standards, franchise agreements, and maintaining control over all aspects of operations. This allows the parent brand to exchange the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a local property or franchise contract and still profit. Because of this, the hotel locations and parent brands are inextricably intertwined.

91. The average customer does not see this relationship. The parent brand gives the property its identity. The parent brand provides signage that assures customers that if they check into that hotel they can expect the standards consistent with the parent brand. The parent companies

– G6 Parent Hotel Defendants—hold themselves out to the public as the owners of the property. And here, they were the actual owners for the trafficking period. These brand requirements are contractual with the power to control weighed heavily toward the corporate parent brand.

92. Upon information and belief, at all times of trafficking alleged herein and currently, the G6 franchised hotels typically pay a percentage of their total revenue back to the parent company and are required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

93. Upon information and belief, per the franchise agreements, G6 Parent Hotel Defendants, may enforce standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of G6 Parent Hotel Defendants to enforce their brand standards, including safety standards, is not just their right but their responsibility.

94. Upon information and belief, at all times of trafficking alleged herein, reservation information for rooms at the subject motel passed through a system operated and managed by G6 Parent Hotel Defendants.

95. All Defendants profited from the sex trafficking of Plaintiff when they rented rooms to Plaintiff and/or her traffickers when they knew or should have known that human trafficking was occurring.

96. All Defendants benefited from the steady stream of income that Plaintiff's traffickers brought to their hotels and hotel brand.

97. All Defendants profited from every room that Plaintiff's traffickers rented where Plaintiff was harbored and maintained for the purpose of sex trafficking.

98. G6 Parent Hotel Defendants, including G6 Property, LLC, facilitated trafficking through its practices, policies, and procedures. They failed to take appropriate action to prevent the trafficking of individuals, including Plaintiff, for sex so they could continue to profit from the room rentals, and business that trafficking brings.

99. Defendants' franchisee employees and agents observed and should have observed the buyers parading in and out of its hotel rooms to engage in the sex trafficking of Plaintiff, and those similarly situated. Their employees and agents observed or should have observed the trafficking occurring regularly and for multiple days at a time at the subject Motel 6 location but ignored it so they could profit.

**Defendants' Ventures**

` 100. Each Defendant directly benefited from facilitating trafficking at the G6 branded properties including in the following ways:

a. They directly benefited from increased revenue each time a room was rented, including each room rented to a trafficker.

b. Each Defendant received increased revenue each time a room was rented at the G6 branded properties, including each room rented to a trafficker, because the payments these defendants received pursuant to their agreement were primarily determined by gross room revenue.

c. Each Defendants received increase revenue each time a room was rented at G6 branded properties, including each room rented to a trafficker. Upon information and belief, the revenue derived from operation of these properties was distributed among Defendants pursuant to written agreements and established practices.

101. By participating in a venture that facilitated sex trafficking, each Defendant also benefitted by keeping operating costs low, maintaining the loyalty of the segment of their customer base seeking to participate in the sex trade and by not acknowledging the pervasive nature of sex trafficking in their hotels generally and at the named hotels herein specifically.

102. Through the conduct described above, Defendants knowingly benefited from engaging in a venture, in the form of an ongoing business relationship, with sex traffickers at the G6 branded properties, including the Jane Does' traffickers, as follows:

a. As detailed above, each Defendant received benefits, including increased revenue, every time a room was rented at the subject Motel 6s.

b. This venture violated 18 U.S.C. §1591 through the actions of the criminal traffickers at the G6 branded properties, which each Defendant knew or should have known about.

c. Defendants associated with traffickers, including the Jane Does' traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

d. Defendants had a mutually beneficial relationship with the traffickers at the subject G6 properties fueled by sexual exploitation of victims.

e. Sex traffickers, including the Jane Does' traffickers, frequently used the G6 branded properties for their trafficking because of an implicit understanding that these hotels provided a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred because of the conduct of Defendants facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for Defendants.

f. Each of the Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g. The Jane Does' trafficking at the subject Motel 6 properties resulted from Defendants' participation in a venture with criminal traffickers. If Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from the Jane Does' trafficking at the Subject RRIs.

103. Through the conduct described above, each of the Defendants also knowingly benefited from engaging in a commercial venture with other Defendants and with hotel staff as follows:

a. Defendants associated with one another and with the hotel staff to operate the Subject Motel 6 properties.

b. As detailed above, each Defendant received financial benefits from operating the subject Motel 6 properties, including revenue generated specifically by renting rooms to traffickers. Defendants engaged in revenue sharing and had a common incentive to maximize revenue.

c. This venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of the hotel staff and the Defendants' facilitation of widespread sex trafficking at the subject Motel 6 properties.

d. Despite actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), Each Defendant participated in the venture by continuing to associate with the hotel staff and with other Defendants to operate the subject

G6 properties in a way that the Defendants knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like the Jane Does.

e. The Named Plaintiffs' trafficking at the subject G6 properties resulted from the hotel staff and Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the G6 properties. Had Defendants not continued participating in a venture that they knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), they would not have received a benefit from the Jane Does' trafficking at the subject G6 branded properties.

**The Sex Trafficking of Jane Doe 1 (A.E.)**

104. Jane Doe 1 (A.E.) was trafficked in 2017 at the Motel 6, 750 Morse Road, Columbus, Ohio 43229 ("Ohio Motel 6")

105. By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, A.E. was held captive and sold for sex by her trafficker the Ohio Motel 6.

106. During the time that she was trafficked, Jane Doe 1's trafficker frequently rented rooms at the Ohio Motel 6 because the rooms provided convenient, anonymous, and relatively central locations for "johns" to pay to engage in sex with A.E.

107. Throughout her trafficking, Jane Doe 1's trafficker connected with "johns" by posting or causing to be posted advertisements on Backpage advertising fo availability for commercial sex. Jane Doe 1's trafficker posted many of these advertisements and had conversations with "Johns" while connected to Defendants' Wi-Fi.

108. Jane Doe was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

109. While under the coercive control of her trafficker, Jane Doe 1 was imprisoned in Defendants' hotel rooms rented by her trafficker and was forced to have sex for money.

110. During her captivity, A.E. was raped, continuously physically and verbally abused, malnourished, psychologically tormented, kidnapped, and imprisoned. Her deterioration and poor health conditions and her desperation were obvious to anyone who saw her.

111. Defendant's staff would have seen the signs of A.E.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and poor health.

112. Jane Doe 's traffickers followed a repetitive and routine procedure during stays and Defendant knew or should have known of Jane Doe 1's trafficking.

113. As such, through its relationship with the staff at the hotel where Jane Doe 1 was trafficked and the perpetrator who trafficked A.E. at the hotel while registered as a guest there, Defendants knowingly benefited or received something of value from its facilitation of, or participation in, a venture which it knew or should have known was violating the TVPRA.

114. More specifically, Defendants leased rooms to Jane Doe 1's traffickers, when they knew, or should have known, that the room was being used to imprison Jane Doe 1, physically assault her, and subject her to repeated exploitation as she was forced into sexual servitude.

**The Sex Trafficking of Jane Doe 2 (C.M.)**

115. Jane Doe 2 (C.M.) was trafficked in 2020 at the Motel 6, 100 Greshamwood Place, Richmond, Virginia 23225 ("Virginia Motel 6").

116. By means of a combination of force, coercion, violence, threats, manipulation,

compelled use of and dependency on illegal substances, and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, Jane Doe was held captive and sold for sex by her trafficker,

117. C.M. was physically beaten in the hallway of the Virginia Motel 6 by a "john," she was beat in the rooms where the door was kicked in, and she was held at gunpoint.

118. C.M. was beaten regularly outside the rooms at the Virginia Motel 6. Her trafficker regularly pushed her against the walls in the hallway and put a gun to her head . This was in view of employees at the Virginia Motel 6, C.M. would pray that somebody would call the police, yet no one called the police to help her.

119. There were men in and out of the rooms so that it was obvious commercial sex was happening at the Virginia Motel 6.

120. The trafficker paid for the rooms in cash.

121. There was obvious signs of drug use by C.M.'s traffickers.

122. Defendants' rooms at the motel locations provided convenient, anonymous, and relatively central locations for "johns" to pay to engage in sex with Jane Doe 2.

123. Throughout her trafficking, Jane Doe 2's trafficker connected with "johns" by posting or causing to be posted advertisements on Backpage advertising for Jane Doe's availability for commercial sex. Jane Doe 2's trafficker posted many of these advertisements and had conversations with "Johns" while connected to Defendants' Wi-Fi.

124. Jane Doe 2 was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

125. While under the coercive control of her trafficker, Jane Doe 2 was imprisoned in Defendants' hotel rooms rented by her trafficker and was forced to have sex for money.

126. During her captivity, Jane Doe 2 was raped, continuously physically and verbally abused, malnourished, psychologically tormented, kidnapped, and imprisoned. Her status as a minor, her deterioration and poor health conditions and her desperation were obvious to anyone who saw her.

127. At the above listed hotel, Jane Doe 2 encountered the same staff on multiple occasions. Defendant's staff would have seen the signs of Jane Doe 2's deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties as well as signs of malnutrition and poor health.

128. Every time Jane Doe 2 interacted with Defendant's staff, it was readily apparent that Jane Doe 2 was under the control of her trafficker or traffickers.

129. Jane Doe 2's traffickers followed a repetitive and routine procedure during stays at the Defendant's branded properties, and Defendant knew or should have known of Jane Doe 2's trafficking.

130. As such, through its relationship with the staff at the hotel where Jane Doe 2was trafficked and the perpetrator who trafficked Jane Doe 2 at the hotel while registered as a guest there, Defendants knowingly benefited or received something of value from its facilitation of, or participation in, a venture which it knew or should have known had engaged in sex trafficking.

131. More specifically, Defendants leased rooms to Jane Doe 2's traffickers, when they knew, or should have known, that the room was being used to imprison Jane Doe 2, physically assault her, and subject her to repeated exploitation as she was forced into sexual servitude.

**<u>The Sex Trafficking of Jane Doe 3 (J.L.C.)</u>**

132. Jane Doe 3 (J.L.C.) was trafficked at 2641 Appliance Ct, Raleigh, North Carolina 27604 ("North Carolina Motel 6") when she was a minor.

133. By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, Jane Doe was held captive and sold for sex by her traffickers in 2016.

134. During the time that she was trafficked, Jane Doe 3's traffickers frequently rented rooms at the Defendants' motel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" to pay to engage in sex with Jane Doe 3.

135. Throughout her trafficking, Jane Doe 3's traffickers connected with "johns" by posting or causing to be posted advertisements on Backpage advertising for Jane Doe's availability for commercial sex. Jane Doe 's trafficker posted many of these advertisements and had conversations with "Johns" while connected to Defendants' Wi-Fi.

136. Jane Doe was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

137. While under the coercive control of her trafficker, Jane Doe 3 was imprisoned in Defendants' hotel rooms rented by her trafficker and was forced to have sex for money. She was held in sexual servitude.

138. During her captivity, Jane Doe 3 was raped, psychologically tormented, kidnapped, and imprisoned. Her status as a minor and her desperation were obvious to anyone who saw her.

139. At the above listed hotels, Jane Doe 3 encountered the same staff on multiple occasions. Defendant's staff would have seen the older men going to the room of a child. It was apparent to all that J.L.C. was being sold for sex as a minor.

140. Every time Jane Doe 3 interacted with Defendant's staff, it was readily apparent that Jane Doe was a minor under the control of her trafficker or traffickers.

141. Jane Doe 3's traffickers followed a repetitive and routine procedure during stays at the Defendant's branded properties, and Defendant knew or should have known of Jane Doe's trafficking.

142. As such, through its relationship with the staff at the hotel where Jane Doe 3 was trafficked and the perpetrator who trafficked Jane Doe at the hotel while registered as a guest there, Defendants knowingly benefited or received something of value from its facilitation of, or participation in, a venture which it knew or should have known had engaged in sex trafficking.

143. More specifically, Defendants leased rooms to Jane Doe's traffickers, when they knew, or should have known, that the room was being used to imprison Jane Doe, physically assault her, and subject her to repeated exploitation as she was forced into sexual servitude.

144. As to Named Plaintiffs, Defendants knew, or should have known, that they were being trafficked and that Defendants were knowingly benefiting financially from said exploitation, because their traffickers frequented G6 hotels and always engaged in similar obvious practice.

145. Defendants knew, or should have known, that the Named Plaintiffs were being trafficked because the Named Plaintiffs entertained crowds of traffic to appease their traffickers behavior that indicated they were using Defendants' hotels for illegal sex trafficking ventures.

146. Defendants participated in this illegal endeavor by knowingly or negligently providing lodging to the Named Plaintiffs' traffickers in which to harbor them.

147. Defendants profited from the sex trafficking of the Named Plaintiffs and knowingly or negligently aided their traffickers in their criminal ventures. Defendants took no action as the Named Plaintiffs' traffickers repeatedly visited Defendants' branded motels for the purpose of illegal sex trafficking.

148. Defendants participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from in which to the Named Plaintiffs to harbor them in furtherance of her being trafficked for commercial sex.

149. Defendants had the opportunity to stop the Named Plaintiffs' traffickers and similar offenders from victimizing the Jane Does and others like them. Instead, Defendants failed to recognize or report the Jane Does' trafficking and take reasonable measures to prevent or stop sex trafficking from occurring in its hotels.

150. Defendants financially benefited from the sex trafficking of the Named Plaintiffs and other victims like them and developed and maintained business models that attracted and fostered the commercial sex market for traffickers and buyers alike.

151. Defendants financially benefit from their ongoing reputation for privacy discretion, and the facilitation of commercial sex.

152. In order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers, Defendants maintained their deficiencies to maximize profits by: 1) avoiding the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and responsive steps to take; 2) not refusing room rentals, or not reporting guests to law enforcement; and 3) reducing security costs by not implementing effective security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation.

153. Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on its properties.

154. As a direct and proximate result of these egregious practices on the part of Defendants, the Jane Does and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**Defendants' Knowledge of Sex Trafficking at Their Locations**

155. Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[21] The United Nations,[22] international non-profits,[23] and the U.S. Department of Homeland Security,[24] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds the industry.

156. For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms

---

[21] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[22] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[23] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[24] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

157. Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[25] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[26] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

158. Defendants, on information and belief, has access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other hotel locations from acting to protect the victims of such suspected human traffickers.

159. Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

160. Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently

---

[25] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

[26] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

161. Defendants monitored these complaints and reviews and, upon information and belief, each hired a third party vendor, such as Reputology and/or Medallia, to send reports of all complaints and reviews to the corporate headquarters of the Defendant who either ignored and/or failed to take any action about the complaints about prostitution and/or human trafficking reported to them.

162. As part of a conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties. Furthermore, Defendants did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

163. Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on its properties and the rate at which those occurrences changed because of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

164. With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like Jane Doe to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

165. Plaintiff, individually and on behalf of members of the Class, injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

166. Defendants are jointly and severally liable for the classes' damage in this case.

**Defendants Facilitated and Harbored the Trafficking of the Jane Does**

167. Defendants are a signatory of the Code[27] and thereby have promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

168. Defendants are a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Defendants publicly committed to participate in the programs to assist in identifying and preventing sex trafficking inside their brand hotels. Therefore, Defendants not only should have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

169. Defendants profited from the sex trafficking of Jane Doe. Defendants rented rooms to and provided Wi-Fi to Jane Doe's trafficker when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where Jane Doe was trafficked. The hotel staff, especially front desk staff, at Defendants' branded properties knew or should have known of the obvious signs of Jane Doe's trafficking.

170. Defendants benefited from the steady stream of income that Jane Doe's trafficker and "johns" bring to its hotel brands. Defendants profited from each and every room that Jane Doe's trafficker and customers rented where Jane Doe was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time Jane Doe's trafficker and customers used Defendants' Wi-Fi to advertise and solicit Jane Doe for commercial sex.

171. Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have

[27] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

been aware of the benefits they were receiving from the human trafficking occurring at the locations where Jane Doe was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

172. Moreover, Defendants repeatedly collected data on Jane Doe, her traffickers, and her "johns" from her many stays at Defendants' branded properties, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendants' employees witnessed the obvious signs of Jane Doe's trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants had taken proper measures, behaving as a reasonably diligent corporation, Defendants would not have profited from Jane Doe and other victims like her being trafficked at their branded locations.

173. Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where Jane Doe was trafficked. Upon information and belief, these policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

174. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal

activity, web data indicating use of commercial sex websites, and data associated with reservations to the parent corporations of the branded properties. The staff at the properties where Jane Doe was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

175. In addition, Defendants had access to and monitored much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

176. Defendants failed to engage in reasonably diligent corporate conduct or take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of its branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in its hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use their powers as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

177. As a direct and proximate result of these egregious practices on the part of the Defendants, Jane Doe and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**Defendants are Jointly and Severally Liable for Plaintiffs' Damages**

178. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Plaintiffs, individually, and the Class.

179. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Plaintiff for past and future losses she, and the Class, suffered as a proximate result of her sexual exploitation and trafficking.

## TOLLING OF LIMITATIONS

180. All claims asserted herein are timely under applicable federal and state statutes of limitation, including but not limited to 18 U.S.C. § 1595(c) and 28 U.S.C. § 1658(a). To the extent any claim would otherwise appear untimely, the limitations period was tolled under the federal discovery rule, the doctrine of fraudulent concealment, equitable tolling principles recognized in the Sixth Circuit, the continuing violation doctrine, and the separate accrual rule applicable to civil

RICO claims.

181. Under federal law, a claim accrues "when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury." *Rotella v. Wood*, 528 U.S. 549 (2000). The Sixth Circuit applies the injury-discovery rule to civil RICO and other federal claims. See *Sims v. Ohio Cas. Ins. Co.*, 151 F. App'x 433 (6th Cir. 2005). In the Sixth Circuit, accrual does not require knowledge of the full extent of the injury or the full scope of the enterprise; rather, it turns on when the plaintiff knew or should have known of both the injury and its cause. *Redmon v. Sud-Chemie Inc. Ret. Plan*, 547 F.3d 531 (6th Cir. 2008).

182. To the extent that Defendant asserts an affirmative defense of limitations against the class invokes the discovery rule. At the time the Named Plaintiffs and the class were harmed and through the end of their trafficking, they were under the coercion and control of their traffickers who exercised coercive control over them, and severely restricted their freedom. As a result, the Named Plaintiffs and the class lacked the information and capacity to understand her injuries and their legal causes.

183. At the time the Named Plaintiffs and the class were harmed, they did not know that they were the victims of human trafficking as that term is defined by law, that their injury arose from being "trafficked" at Defendants' hotels or that they were a person "trafficked," much less that they were the "victim" of a legal venture involving Defendants, and they did not discover and were not in a position to discover the legal cause of their injury, more than ten years before suit was filed.

184. To the extent Defendants assert an affirmative defense of limitations, the Named Plaintiffs and the class invoke the doctrine of equitable tolling because, as a result of beings victim of trafficking, they faced extraordinary circumstances, which arose through no fault of their own,

that prevented them from filing a lawsuit, and those circumstances did not end more than 10 years before they filed this lawsuit.

185. While under the control of their traffickers the Named Plaintiffs and the class did not have the freedom to investigate their claims, to identify those responsible, or to seek legal representation necessary to pursue their legal rights. They could not have pursued their claims while under the active control of their traffickers despite the exercise of ordinary diligence.

186. To the extent Defendant asserts an affirmative defense of limitations, the Named Plaintiffs and the class also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

187. This continuous trafficking resulted from Defendants' facilitation of trafficking at the subject properties and Defendants' ongoing ventures with one another and with criminal traffickers at those hotel properties.

188. Under the injury discovery rule, the separate accrual doctrine, fraudulent concealment principles, equitable tolling standards, and continuing violation doctrine recognized by the Supreme Court and the Sixth Circuit, Plaintiffs' claims are timely. Defendants are equitably barred from asserting any statute of limitations defense.

## CLASS ACTION ALLEGATIONS

190. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

**<u>The Class and Subclasses:</u>**

191. Plaintiff brings this suit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all members of the following Class:

> All persons who (1) were trafficked, as defined by the Trafficking Victims Protection Reauthorization Act; (2) in the territory of the United States; (3) where such trafficking occurred in whole or in part on the property of; (4a) an establishment owned by Defendants; and/or (4b) an establishment conducting business under a brand or trade name owned or controlled by Defendants (hereinafter, "Victims of Trafficking Class")

192. Alternatively, or in addition to the Victims of Trafficking Class, Plaintiff also brings pursuant to Fed. R. Civ. P. 23 on behalf of themselves the following subclasses:

a.) All Class Members who were under the age of eighteen (18) at the time they were trafficked at Defendants' branded properties (Minor Victim Subclass)

b.) All Class Members who were trafficked during materially uniform corporate policy regimes, including but not limited to periods before and after Defendants centralized digital platform overhaul.

193. Plaintiffs reserve the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

194. Excluded from the Class are: (1) any Judge or Magistrate Judge presiding over this action and members of their families; (2) G6's subsidiaries, parents, successors, predecessors, and any entity in which Defendants have a controlling interest, and its current or former employees, officers, and directors; (3) counsel for Plaintiff and Defendants (and employees of their firms); and (4) legal representatives, successors, or assigns of any such excluded persons.

195. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims

196. This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

**<u>Numerosity: Fed. R. Civ. P. 23(a)(1)</u>**

197. The members of the Classes are so numerous and geographically dispersed that individual joinder of all members is impracticable. Plaintiffs are informed and believe that there are thousands of members of the Classes, the precise number being unknown to Plaintiff, but such number being ascertainable from Defendant's records. Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Commonality and Predominance: Fed. R. Civ. P. 23(a)(2)**

198. This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation: Common questions include, but are not limited to, the following:

(a) Whether Defendants received a financial benefit from the sex trafficking occurring in their hotel properties;

(b) Whether Defendants received anything of value from the sex trafficking occurring in their hotel properties;

(c) Whether Defendants knew or should have known that they were receiving a financial benefit or other thing of value from the sex trafficking occurring in their hotel properties;

(d) Whether Defendants "participated in a venture" of sex trafficking as defined by 18 U.S.C. § 1595(a);

(e) Whether Defendants knew or should have known that they were participating in a venture of sex trafficking as defined by 18 U.S.C. § 1595(a);

(f) Whether Plaintiff and Class Members are entitled to restitution, damages, compensation, or other monetary relief; and

(g) Whether Plaintiff and Class Members are entitled to injunctive relief.

199. Common sources of evidence may also be used to demonstrate Defendants' unlawful conduct on a class-wide basis, including, but not limited to documents and testimony about its sex trafficking prevention policies and practices (or lack thereof); documents and testimony about the nature of trafficking operations occurring at Defendants' properties; documents and testimony regarding Defendants' awareness of the trafficking operations occurring at Defendants' properties; and documents and testimony about the financial benefits that accrued to Defendants from the sex trafficking occurring in their properties.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

200. Plaintiff's claims are typical of the claims of other members of the Classes because, among other things, all such members were similarly situated and were comparably injured through Defendant's wrongful conduct as set forth herein.

**Adequacy: Fed. R. Civ. P. 23(a)(4)**

201. Plaintiffs are adequate representatives for the Classes because their interests do not conflict with the interests of other members of the Classes she seeks to represent. Plaintiffs have retained counsel competent and experienced in complex litigation and Plaintiffs intend to prosecute the action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel. including cases alleging violations of the TVPRA.

**Superiority: Fed. R. Civ. P. 23(b)(3)**

202. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other members of the Classes are relatively small compared to the burden and expense that

would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.

203. Even if members of the Classes could afford individual litigation, the Court system likely could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, comprehensive supervision by a single court, and finality 14 of the litigation.

**Certification of Specific Issues: Fed. R. Civ. P. 23(c)(4)**

204. To the extent that any described Class herein does not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiff, individually and on behalf of members of the Class, seek the certification of issues that will drive the litigation toward resolution.

**Declaratory and Injunctive Relief: Fed. R. Civ. P. 23(b)(2)**

205. Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the members of the Classes as a whole.

206. Class certification is appropriate under Rule 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Class as a whole, such that final injunctive relief is appropriate with respect to the Class as a whole. The nature of the relief sought is described in this Complaint.

207. Absent a class action, most of the members of the Class would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. Class treatment of

common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. Finally, Class treatment would minimize the trauma that Class members would experience as a result of litigating their claims on an individual basis, and further promotes the remedial purposes of the federal statutes under which the claims are brought.

208. The Classes also satisfy the criteria for certification under Federal Civil Rule 23(b)(3). Plaintiff avers that the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudication which would establish incompatible standards of conduct for Defendants; that the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; that Defendants have acted or refused to act on grounds that apply generally to the proposed classes, thereby making final injunctive relief or declaratory relief described herein appropriate with respect to the proposed classes as a whole; that questions of law or fact common to the Classes predominate over any questions affecting only individual members and that class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy which is the subject of this action.

209. In the alternative, Plaintiff, individually and on behalf of members of the Class, seeks certification of the following issues for certification pursuant to Federal Rule of Civil Procedure 23(c)(4):

(a) Whether Defendants received a financial benefit from what they knew or should have known resulted from sex trafficking ventures occurring in their hotel properties;

(b) Whether Defendants received anything of value from the sex trafficking ventures occurring in their hotel properties;

(c) Whether Defendants knew or should have known that they were receiving a financial benefit or other thing of value from the sex trafficking ventures occurring in their hotel properties;

(d) Whether Defendants "participated in a venture" of sex trafficking as defined by 18 U.S.C. § 1595(a); and

(e) Whether Defendants knew or should have known that their profits resulted from participating in a venture of sex trafficking as defined by 18 U.S.C. § 1595(a);

210. Plaintiff, individually and on behalf of members of the Class, further states that the interests of judicial economy will be served by concentrating litigation concerning these claims in this Court, and that the management of the Classes will not be difficult.

211. Plaintiff and other Class Members have suffered injury, harm, and damages because of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants will continue to allow sex trafficking to occur on their properties and reap the consequential unlawful benefits from that trafficking.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the Trafficking Victim's Protection Reauthorization Act 18 U.S.C. § 1595 ("TVPRA")

Named Plaintiffs, individually and on behalf of members of the Class, incorporates all preceding paragraphs as fully set forth herein. Named Plaintiffs' TVPRA claim is on behalf of the Class set forth above.

212. Named Plaintiffs and Class Members are victims of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under direct and indirect theories of liability against anyone who knowingly benefited from participation in a venture that the person or entity knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

213. Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants have a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, Defendants breached this duty by participating in, and facilitating, the harboring and providing of Jane Doe and class members for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

214. Defendants financially benefited because of these acts, omissions, and/or commissions by keeping operating costs low and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, Defendants directly benefitted from the trafficking of Jane Doe and class members on each occasion it received payment for rooms in which they were being kept in at the Defendants' hotels. The actions, omissions, and/or

commissions alleged in this pleading were a *but for* and proximate cause of Jane Doe and class members' injuries and damages.

215. Named Plaintiffs and Class Members have suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591 (a).

216. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

217. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

218. Defendants acted as the actual agents when operating their respective hotel properties and in committing the wrongful acts and inactions alleged herein.

219. Through the wrongful acts and omissions described throughout this Complaint, Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate their respective hotel properties.

220. Defendants are vicariously liable for the TVPRA violations of their franchisees, and the subagents of such franchisees.

221. Additionally, on information and belief, each of the Defendants participated in a joint venture operating hotel properties. They had highly integrated operations at the hotels, shared revenue and profits generated from the hotels and exercised mutual control over the venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another and are therefore each directly and proximately liable for the harms and damages caused to Plaintiff as a result.

222. Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other and traffickers, including Plaintiff's traffickers, despite the fact that each defendant knew or should have known that these traffickers were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2) at Defendants' properties, including the subject locations alleged in this Complaint. More specifically, all Defendants took part in a common undertaking and enterprise involving risk and potential profits, and here, actual profits resulted. All Defendants' employees had a direct association with the traffickers and knowingly facilitated the traffickers, which, as shown more thoroughly in the incorporated allegations above, showed a continuous business relationship between the traffickers and Defendants such that the pattern of conduct appears to be a tacit agreement between them. Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

223. Through the acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with each other in the operations of their respective hotel properties even though Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

224. Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Plaintiff to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

## SECOND CAUSE OF ACTION:

### Violation of The Child Abuse Victims Rights Act ("CAVRA"),

225. Plaintiff, individually and on behalf of members of the Class, incorporates all preceding paragraphs as fully set forth herein. Plaintiff's CAVRA claim is on behalf of the Class set forth above.

226. Plaintiff and Class Members were "minors" pursuant to 18 U.S.C. § 2255(a) when they were trafficked.

227. Plaintiff and Class Members were "victims" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

228. Plaintiff and Class Members suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

229. Plaintiff and Class Members were "person[s]" who have "not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

230. Defendants knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff and class members to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2).

231. Defendants knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff and class members to engage in commercial sex acts.

232. Defendants engaged in a conspiracy to ignore and actively refrain from engaging in any conduct that would prevent them from profiting from sex trafficking at its branded properties.

233. Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## THIRD CAUSE OF ACTION

### Conspiracy to Violate the TVPRA and CAVRA

234. Plaintiff, individually and on behalf of members of the Class, incorporates by reference all preceding paragraphs as if fully set forth herein.

235. Plaintiff brings this claim pursuant to 18 U.S.C. § 1595(a), which expressly provides a civil cause of action against any person or entity who knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value, from participation in a venture which that person knew or should have known has engaged in an act in violation of 18 U.S.C. §§ 1581 et seq.

236. At all relevant times, Defendants entered into and participated in a joint enterprise and conspiratorial agreement—whether explicit or implicit—to knowingly benefit financially from sex trafficking occurring at the branded hotel property.

237. Defendants' actions demonstrate the existence of a unity of purpose, common design, and meeting of the minds to derive profit from the rental of rooms used for sex trafficking, while deliberately avoiding the adoption or enforcement of measures that would disrupt that revenue stream.

238. The conspiratorial agreement was not an agreement to traffic victims directly, but rather an agreement to knowingly benefit financially from sex trafficking, which is the precise conspiratorial object prohibited by § 1595(a).

239. As courts have recognized, including in *Fleites v. Mindgeek S.A.R.L.*, 617 F. Supp. 3d 1146, 1163–64 (C.D. Cal. 2022), a meeting of the minds may be inferred where defendants enter into a joint enterprise with consciousness of its general nature and extent, and continue to provide the instrumentalities of trafficking despite knowledge of ongoing exploitation.

240. In furtherance of the conspiracy, Defendants committed overt acts including, but not limited to:

a.) Knowingly maintaining and enforcing brand standards, policies, and training protocols that tolerated or normalized the rental of rooms to known or suspected sex traffickers;

b.) Providing hotel rooms, Wi-Fi, and related services that Defendants knew or should have known were being used to harbor victims and facilitate commercial sex acts;

c.) Continuing to recognize and operate the property as a branded hotel, despite repeated indicators of sex trafficking activity and the resulting revenue derived therefrom;

d.) Sharing in the proceeds of room rentals and associated fees, including franchise fees and other payments directly tied to room occupancy and gross revenue;

e.) Failing to implement, enforce, or audit meaningful anti-trafficking policies, despite industry-wide knowledge, prior incidents, complaints, and internal data demonstrating that trafficking was occurring at the property;

f.) Coordinating roles between franchisor and franchisee such that each Defendant benefitted financially while insulating itself from direct intervention that would reduce profits.

g.) These actions constitute far more than mere parallel conduct. Rather, they reflect a concentrated, coordinated decision to prioritize revenue over compliance and victim safety, consistent with the principles articulated in *Bates v. Sequel Youth & Family Services, LLC*, 2024 U.S. Dist. LEXIS 118421, at *32–34 (N.D. Ala. July 3, 2024).

241. Defendants were aware of the conspiratorial goal—to benefit financially from the continued rental of rooms used for sex trafficking—and voluntarily participated in helping to accomplish that goal, satisfying the standard for conspiracy under § 1595(a).

242. Defendants' knowledge may be inferred from circumstantial evidence, including but not limited to:

a.) Repeated and obvious red flags of trafficking at the property;

b.) Prior law-enforcement activity, complaints, and guest reports;

c.) Industry-wide recognition that branded economy hotels are frequent sites of sex trafficking;

d.) Defendants' deliberate failure to alter policies or practices that generated revenue from the trafficking venture.

243. As in *Fleites*, Defendants are not alleged to have merely created incentives for trafficking; rather, they knowingly provided and maintained the instrumentalities through which sex trafficking was monetized, while sharing in the resulting profits.

244. Defendants need not have known the identities of specific victims or traffickers, nor participate in every act of trafficking. It is sufficient that Defendants knew or should have known of the venture's unlawful nature and agreed—explicitly or implicitly—to continue benefiting from it.

245. Through their coordinated conduct, Defendants participated in a "venture" within the meaning of § 1595(a), defined as a group of individuals or entities associated in fact, whether or not a legal entity, engaged in sex trafficking activity from which Defendants knowingly derived financial benefit.

246. Defendants' participation included affirmative acts and deliberate omissions, undertaken with knowledge that sex trafficking was occurring and that Defendants were profiting from it.

247. Defendants' conspiracy to knowingly benefit financially from sex trafficking was a substantial factor and proximate cause of Plaintiff's injuries.

248. As a direct and foreseeable result of Defendants' unlawful conspiracy, Plaintiff suffered severe physical, emotional, psychological, and economic harm.

249. Pursuant to 18 U.S.C. § 1595(a), Defendants are jointly and severally liable for Plaintiff's damages, restitution, disgorgement of profits, attorneys' fees, and costs.

## FOURTH CAUSE OF ACTION

### Civil Racketeer Influenced and Corrupt Organizations Violation
### 18 U.S.C. § 1961(4)

250. Plaintiff, individually and on behalf of members of the Class, incorporates by reference all preceding paragraphs as if fully set forth herein.

251. At all times relevant, Defendants its agents, employees, contractors, and affiliated entities (collectively, the "Enterprise") constituted an association-in-fact enterprise under 18 U.S.C. § 1961(4), engaged in activities affecting interstate commerce.

252. The Enterprise was an ongoing organization with a common purpose: to profit from illegal human trafficking, including sex and labor trafficking, while using their premises and Defendants' systems to facilitate, conceal, and profit from these activities.

253. Enterprise conducted its affairs through a structured network of individuals and entities who:

a. Controlled and managed the Premises;

b. Facilitated trafficking through negligent or willful failure to report or intervene;

c. Advertised, recruited, or hosted trafficking victims through online platforms, reservations systems, or other commercial channels;

d. Misrepresented safety, security, and legal compliance to employees, customers, and the public.

254. Defendants and the Enterprise engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961(1), including multiple predicate acts of:

a. Human trafficking, in violation of 18 U.S.C. §§ 1589–1595, through repeated acts of recruitment, harboring, and transportation of victims for forced commercial sex;

b. Conspiracy to commit the above acts, in violation of 18 U.S.C. § 371, by coordinating with agents, employees, or contractors to facilitate trafficking while concealing the activity.

255. These acts occurred repeatedly over a period of time, demonstrating continuity and relatedness sufficient to establish a pattern of racketeering activity.

256. Defendants directly and indirectly conducted and participated in the affairs of the Enterprise through:

a. Oversight, policy-setting, and operational control of the Premises;

b. Direction or tacit approval of staff who ignored trafficking indicators;

c. Use of interstate communications, online booking platforms, and advertising channels to conceal, facilitate, or profit from trafficking activity.

257. As a direct and proximate result of Defendants violation of 18 U.S.C. § 1962(c) and § 1962(d), Plaintiffs suffered:

a. Physical harm and sexual exploitation;

b. Severe emotional distress and psychological trauma;

c. Economic harm, including lost earnings and costs of treatment;

d. Other consequential damages, all of which are ongoing.

## FIFTH CAUSE OF ACTION

### Conspiracy to Violate the Civil Racketeer Influenced and Corrupt Organizations Violation 18 U.S.C. § 1962(d)

258. Plaintiff, individually and on behalf of members of the Class, incorporates by reference all preceding paragraphs as if fully set forth herein.

259. At all relevant times, Defendants, together with their agents, employees, franchisees, contractors, management companies, and affiliated corporate entities (collectively, the "Enterprise"), constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), engaged in and affecting interstate commerce.

260. The Enterprise was an ongoing organization, formal and informal, with a common purpose: to generate revenue and maximize occupancy rates and ancillary profits, including revenue derived from rooms used for commercial sex and human trafficking, while failing to implement, enforce, or act upon anti-trafficking safeguards despite known red flags and industry-wide notice of trafficking risks within hotels.

261. The Enterprise functioned as a continuing unit through corporate governance structures, franchise agreements, centralized reservation systems, revenue management programs, and standardized operational policies that allowed Defendants to profit from room rentals and related services regardless of whether those rooms were being used for criminal trafficking activity.

262. Upon information and belief, traffickers routinely use hotels and motels as primary venues for commercial sex because such establishments provide:

a. Short-term, anonymous lodging with minimal scrutiny;

b. Centralized online booking systems enabling rapid interstate movement;

c. Cash payment options or prepaid cards that limit traceability;

d. High guest turnover that masks repeated male visitors;

e. Staff trained to prioritize occupancy and guest satisfaction over intervention.

263. Upon information and belief, a single trafficker exploiting one victim in a hotel setting can generate substantial daily revenue from commercial sex acts, often involving multiple buyers per day over extended periods. Industry studies, law enforcement investigations, and survivor accounts consistently reflect that traffickers may generate thousands of dollars per victim per week, and in many documented cases substantially more, depending on frequency, location, and duration of exploitation.

264. Upon information and belief, traffickers frequently rent hotel rooms for consecutive days or weeks at a time, sometimes rotating among rooms or properties within the same brand network to avoid detection, thereby generating predictable, recurring occupancy revenue for hotel operators.

265. Hotel properties financially benefit from trafficking-related room usage through:

a. Nightly room rates;

b. Extended-stay bookings;

c. Repeat bookings across brand-affiliated properties;

d. Incidental charges, including parking, food, vending, Wi-Fi, and service fees;

e. Increased occupancy metrics that enhance brand valuation, franchise royalties, management fees, and investor returns.

266. Upon information and belief, corporate hotel entities derive revenue not only from direct room rentals but also from franchise fees, percentage-based royalties tied to gross room revenue, centralized reservation fees, marketing fees, and management fees, which increases when rooms are rented, regardless of the underlying criminal use. Thus, when traffickers rent rooms for purposes of commercial sexual exploitation, corporate Defendants receive financial benefit through their revenue-sharing and royalty structures, creating economic incentives to prioritize occupancy and revenue metrics over proactive trafficking intervention.

267. Upon information and belief, Defendants were aware—or deliberately avoided becoming aware—of clear and obvious indicators of sex trafficking occurring at the Premises, including but not limited to:

a. Multiple men visiting a room in short succession;

b. Cash payments or prepaid card usage for extended stays;

c. Excessive requests for linens and towels;

d. Signs of physical injury, fear, or control over a victim;

e. Refusal by a controlling individual to allow housekeeping access;

f. Use of online advertisements linked to specific hotel rooms or locations;

g. Frequent room changes requested by the same individual.

268. Upon information and belief, despite industry-wide guidance, federal awareness campaigns, and widely available training materials addressing trafficking indicators in hotels, Defendants failed to implement adequate monitoring, reporting, auditing, compliance enforcement, or disciplinary mechanisms to meaningfully deter or disrupt trafficking occurring on their properties.

269. The Enterprise conducted its affairs through a structured network of individuals and entities who:

a. Owned, operated, franchised, managed, or controlled the Premises;

b. Established revenue targets and occupancy benchmarks;

c. Failed to require meaningful anti-trafficking enforcement despite notice;

d. Allowed traffickers to rent rooms repeatedly despite obvious red flags;

e. Utilized interstate booking systems and digital communications infrastructure to facilitate room rentals used for trafficking.

270. Defendants' conduct constituted participation in the operation or management of the Enterprise through policy-making authority, oversight of brand standards, control of reservation platforms, revenue management systems, training protocols, and compliance programs.

271. The Enterprise engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961(1), including multiple predicate acts of:

a. Sex trafficking and forced labor trafficking in violation of 18 U.S.C. §§ 1589–1591, through the knowing harboring, benefiting from participation in ventures engaged in trafficking, and provision of premises used to exploit victims;

b. Conspiracy to commit the foregoing offenses in violation of 18 U.S.C. § 371;

c. Financial transactions involving proceeds of unlawful activity, to the extent discovery reveals laundering or reinvestment of trafficking-derived revenue into Enterprise operations.

272. These predicate acts were related in purpose, participants, victims, and methods, and occurred continuously over a substantial period of time, thereby establishing both closed-ended and open-ended continuity sufficient to constitute a pattern of racketeering activity.

273. Upon information and belief, trafficking activity at the Premises was not isolated but occurred repeatedly over months or years, generating recurring room revenue and associated fees for Defendants.

274. Defendants knowingly received, directly or indirectly, financial benefit from participating in ventures that they knew or should have known were engaged in trafficking, and they continued to rent rooms to traffickers despite clear indicators of exploitation.

275. Upon information and belief, traffickers operating in hotel settings routinely generate substantial revenue from the commercial sexual exploitation of victims. Law enforcement investigations, survivor testimony, and publicly reported prosecutions reflect that traffickers commonly charge between approximately $150 and $500 per commercial sex act, depending on location and duration.

276. Upon information and belief, traffickers exploiting a single victim in a hotel environment frequently arrange multiple commercial sex acts per day—often between five (5) and ten (10) buyers daily—resulting in daily gross revenues ranging from approximately $750 to $5,000 per victim.

277. Upon information and belief, where exploitation occurs continuously over days or weeks in the same hotel room, traffickers may generate weekly revenues ranging from approximately $5,000 to $30,000 per victim, and substantially more over extended stays or when multiple victims are exploited simultaneously.

278. Upon information and belief, traffickers often exploit multiple victims concurrently within the same hotel property or rotate among rooms within the same brand system, multiplying the revenue derived from exploitation while maintaining predictable room bookings.

279. Upon information and belief, when a trafficker rents a hotel room for the purpose of commercial sexual exploitation, the hotel property receives nightly room revenue typically ranging from approximately $80 to $250 per night (or more in urban markets), resulting in hundreds or thousands of dollars in room revenue during multi-day exploitation periods.

280. Upon information and belief, corporate Defendants derive financial benefit not only from the base room rate but also from percentage-based franchise royalties, management fees, reservation system fees, marketing fees, and brand assessments calculated as a percentage of gross room revenue—commonly ranging from approximately 4% to 12% or more of room revenue—thereby directly tying corporate profit to occupancy generated by traffickers.

281. Upon information and belief, hotels frequently charge additional fees for internet access, including daily Wi-Fi fees ranging from approximately $5 to $15 per day, premium bandwidth surcharges, or inclusion of internet fees within resort or service fees.

282. Upon information and belief, traffickers regularly used the Premises' Wi-Fi and internet services to facilitate and expand their trafficking operations, including:

a. Posting and updating online commercial sex advertisements;

b. Communicating with buyers;

c. Uploading photographs and pricing information;

d. Coordinating appointments and screening purchasers;

e. Receiving electronic payments or arranging prepaid transactions.

f. Upon information and belief, during the relevant period, traffickers commonly advertised victims through online platforms such as Backpage and CityXGuide, both of which hosted commercial sex advertisements searchable by geographic location.

283. Upon information and belief, traffickers used the hotel's internet connection and Wi-Fi services to post, renew, and manage advertisements on Backpage, CityXGuide, and similar platforms, often including photographs taken within hotel rooms and references to proximity to the hotel location to attract buyers.

284. Upon information and belief, such advertisements were frequently geo-located or identifiable by reference to the city, neighborhood, or even distinctive features of the hotel room interior, further linking the commercial exploitation to the Premises.

285. Upon information and belief, hotel Defendants financially benefited from traffickers' use of paid Wi-Fi services and internet access, either through direct daily Wi-Fi charges, bundled service fees, or increased room rates justified by internet access amenities.

286. Upon information and belief, by providing internet infrastructure, Wi-Fi access, and a physical location used to produce and disseminate commercial sex advertisements, Defendants materially facilitated the expansion and profitability of the trafficking venture.

287. Upon information and belief, Defendants knew or should have known that hotel Wi-Fi networks were being used for repeated commercial sex advertising activity associated with specific rooms, including high-volume data usage consistent with uploading photographs and managing online advertisements. Despite the availability of monitoring tools, content filters, suspicious activity reporting mechanisms, and widely disseminated federal guidance regarding the use of hotels in sex trafficking, Defendants failed to implement reasonable safeguards to detect or disrupt the use of their internet systems for trafficking-related advertising.

288. Upon information and belief, the recurring rental of rooms by traffickers, coupled with paid internet access and related service fees, created a continuing and predictable revenue stream for Defendants tied directly to the exploitation of victims.

289. Upon information and belief, the financial structure of Defendants' operations—emphasizing occupancy rates, revenue per available room (RevPAR), and ancillary service income—created economic incentives to ignore or deliberately avoid investigating trafficking indicators so long as rooms were paid for and revenue targets were met.

290. The revenues derived from trafficking-related room rentals, internet fees, and associated services constitute proceeds obtained through participation in a venture engaged in sex trafficking and form part of the racketeering income underlying Defendants' violations of 18 U.S.C. § 1962(c) and (d).

291. As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1962(c) and (d), Plaintiffs suffered:

a. Physical injury and sexual exploitation;

b. Severe psychological trauma and emotional distress;

c. Loss of income, earning capacity, and educational opportunities;

d. Medical and therapeutic expenses;

e. Other economic and consequential damages.

292. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to recover treble damages, costs, and reasonable attorneys' fees.

**JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Respectfully submitted,

*/s/Syreeta Poindexter*
Syreeta Poindexter (0093063)
Jennifer A. Bogan (0072054)
**BABIN LAW, LLC**
10 West Broad Street
Suite 900
Columbus, OH 43215
P: 614-761-8800
F: 614-706-1775
Syreeta.Poindexter@babinlaws.com
Jenn.Bogan@babinlaws.com